## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS, SPRINGFIELD DIVISION

| | | |
|---|---|---|
| JANET M. LEFLER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 19-cv-3043 |
| | ) | |
| ANDREW SAUL, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

### REPORT AND RECOMMENDATION

TOM SCHANZLE-HASKINS, U.S. MAGISTRATE JUDGE:

Plaintiff Janet M. Lefler appeals from the denial of her application for Social Security Disability Insurance Benefits (DIB) under Title II and Supplemental Security Income (SSI) under Title XVI of the Social Security Act (collectively Disability Benefits). 42 U.S.C. §§ 416(i), 423, 1381a and 1382c. This appeal is brought pursuant to 42 U.S.C. §§ 405(g) and 1383(c). Lefler filed a Brief in Support of Motion for Summary Judgment (d/e 12). The Defendant Commissioner filed a Motion for Summary Affirmance (d/e 17). The Plaintiff also filed a Reply to the Defendant's Motion for Summary Affirmance (d/e 18). This matter is before this Court for a Report and Recommendation. For the reasons set forth below, this

Court recommends that the Decision of the Commissioner should be affirmed.

## STATEMENT OF FACTS

Lefler was born on May 28, 1964.  She graduated from high school and previously worked as a waitress for 26 years.  She alleges she became disabled on July 31, 2014, when an automobile hit her person.  Lefler asserts that she suffers from spondylolisthesis of the lumbar spine status post Transforaminal Lumbar Interbody Fusion (TLIF), failed back syndrome, a history of two prior back surgeries in addition to the TLIF, a left knee ACL tear, chronic obstructive pulmonary disease (COPD), bipolar affective disorder, borderline personality disorder, major depressive disorder, history of stage II breast cancer status post lumpectomy and radiation therapy, and history of carpal tunnel syndrome symptoms. Certified Transcript of Proceedings Before the Social Security Administration (d/e 8 and 9) (R.), at 17-18, 30, 46-47, 544-45.

On August 8, 2013, Lefler saw her primary care provider nurse practitioner Julie Barry, CNP.  Lefler reported that she was walking daily, and her breathing was better.  Her back was generally good, but the pain increased if she sat too long.  She had some carpal tunnel symptoms, but she started using the braces that Barry had given her in the past and they

were helping.  R. 705.  On examination, Lefler was alert and very positive with a lot of energy.  Her lungs were clear.  Barry assessed COPD, disk protrusion L4-L5 and L5-S1 with nerve root compression, and bipolar disorder.  R. 705.

On December 5, 2013, Lefler had a chest x-ray due to her COPD and shortness of breath.  The x-rays showed no acute pulmonary findings and chronic hyperinflation.  Her cardiac size was within normal limits.  R. 438.

On February 20, 2014, Lefler had a chest x-ray.  The x-ray showed no acute pulmonary findings.  Her lungs were hyperinflated and clear.  Her cardiac size was within normal limits.  R. 441.

On May 7, 2014, Lefler had a lumbar epidural steroid injection for her back pain.  R. 444.

On June 19, 2014, Lefler saw advanced practice nurse Nicollette Haubrich, ANP, FNP-BC, at the Southern Illinois University School of Medicine Division of Orthopedics.  Lefler saw Haubrich for a pain assessment.  R. 495-98.  Lefler reported that she currently worked as a waitress at the Elks Club in Quincy, Illinois.  She told Haubrich that she had suffered from low back pain since she was 18.  She had two prior surgeries, in 1989 and 1993, on her lower back at L4-L5 and L5-S1 and had pain in her lower back that radiated down the back of both legs to her

ankles.  She described the pain as constant dull aches with sharp stabs.
Her back locked up at times and interfered with her sleep.  Lefler had
increased pain in the two years before the office visit and her pain was
aggravated with sitting, prolonged standing, twisting, and forward flexion.
Lefler's pain was alleviated with rest and alternating applications of ice and
heat.  R. 495.

Nurse Haubrich stated that a March 5, 2012 MRI of her lower back
showed multilevel spondylosis, L4-L5 disc herniation on the left affecting
the left L5 and S1 root nerves.  A May 17, 2012 lumbar x-ray showed
degenerative changes and lowered disc heights.  On examination, Lefler
had normal respiration, normal posture and gait, normal range of motion in
all joints, normal muscle strength and tone, no edema, and minimal to no
pain on rotation of the hips.  She had discomfort on palpation of the
thoracic and lumbar spines.  Her straight leg testing was positive.  R. 496-
97.  Haubrich's impression was low back pain, failed back syndrome,
lumbar radiculopathy, and lumbar spondylosis.  Haubrich noted that
conservative treatments of epidural injections, physical therapy, and TENS
unit already failed to relieve her pain.  R. 497.  Haubrich recommended
updated imaging, additional physical therapy, and a consultation with

orthopedic surgeon Dr. Nitin Kukkar, M.D., regarding surgical options.  R. 498.

On July 2, 2014, Lefler had an MRI taken of her lumbar spine.  The MRI showed some diffuse bulging at L4-L5 and L5-S1. The radiologist, however, concluded that the disc herniation at L4-L5 had resolved and Lefler had no acute herniations or significant stenoses.  R. 445.

On July 7, 2014, Lefler had x-rays of her lumbar spine.  The x-rays showed mild scoliosis with degenerative changes in the lumbar spine with narrowed L2-L5 interspaces with no evidence of an acute process.  The radiologist concluded that the x-rays showed secondary changes of degenerative disease and mild scoliosis.  R. 446.

On August 1, 2014, Lefler went to the emergency department at Blessing Hospital in Quincy, Illinois.  She had been hit by a car.  X-rays of her left knee showed no fracture, no joint effusion, and no acute osseous abnormality.  R. 453.  A CT scan of Lefler's lumbar spine showed spondylosis of the lumbar spine without a fracture.  R. 456.  A CT scan of her chest showed  some atelectasis or scarring of minimal extent in the left lung base.  R. 455.

On August 6, 2014, an MRI of Lefler's left knee showed an anterior cruciate ligament (ACL) high grade/near complete sprain, medial collateral

ligament complete disruption proximally; intact appearing menisci; a nondisplaced fracture of the lateral tibial plateau with associated marrow edema; a suspected fracture through the fibular head with marrow edema; patchy marrow edema within the lateral femoral condyle as well as anterior medial tibial plateau that may have indicated a direct contusional injury; and moderate joint effusion.  R. 458.

On August 14, 2014, Lefler saw Dr. Kukkar about her knee.  Dr. Kukkar noted that the back surgery was canceled due to the motor vehicle accident.  Dr. Kukkar found that the MRI of her knee showed an ACL tear and a medial cruciate ligament (MCL) tear.  Dr. Kukkar put Lefler in a knee immobilizer and told Lefler not to put any weight on the knee.  R. 506.

On August 22, 2014, Lefler had a chest x-ray.  The x-ray showed no fractures, no focal consolidation, pleural effusion, or pneumothorax.  The radiologist concluded that the x-ray showed no cardiopulmonary disease. R. 452.

On August 26, 2014, Lefler saw Dr. Kukkar for a preoperative visit. On examination, Lefler's respiration was normal.  Her gait was normal, her stance was erect and normal.  She had difficulty heel and toe walking, could not tandem walk, and had poor balance.  She had minimal tenderness in the lumbar spine and had normal muscle tone in her arms

and legs.  Dr. Kukkar's motor exam demonstrated weakness in the lower
extremities, left worse than right.  Dr. Kukkar assessed L4-L5 and L5-S1
severe degenerative disc disease and left sided foraminal stenosis, worse
than right.  Dr. Kukkar discussed surgical options with Lefler and she
agreed to a TLIF surgery at L5-S1.  R. 427.

On October 2, 2014, Lefler saw physical therapist Jill Babey, PT.
Lefler reported that she was hit by a car on August 1, 2014.  She suffered
an ACL and MCL tear in her left knee.  Her left knee was placed in an
immobilizer for eight weeks and was now in a hinged brace.  She had
stiffness in the knee.  Walking and twisting aggravated the pain; rest and
elevation alleviated the pain.  She also reported a history of back pain, two
prior back surgeries, and a third back surgery planned in the near future.
R. 554.  Babey recommended six weeks of physical therapy, with three
sessions per week.  R. 556.

On October 22, 2014, Lefler saw physical therapist Babey for
therapy.  Lefler reported that she no longer had to wear the brace on her
knee unless she was in a crowd.  She might have the back surgery before
any knee surgery.  R. 581.

On October 27, 2014, Lefler saw licensed practical nurse and mental
health professional Kelly Wren, LPN, MPH, at Transitions of Western

Illinois (Transitions), for an Individualized Service Plan.  R. 357-61.  Lefler

was receiving ongoing mental health care at Transitions.  The plan

indicated that Dr. Sanchez was Lefler's mental health care provider.  Wren

gave Lefler a Global Assessment of Functioning (GAF) Score of 65.  The

GAF score was a measure of a clinician's judgment of an individual's

overall level of functioning on a hypothetical continuum of mental health

and illness.  American Psychiatric Assn, Diagnostic and Statistical Manual

of Mental Disorders (4th ed. Text Rev.) (DSM IV-TR), at 32-35.  A GAF

score of 61 to 70 indicated either mild symptoms or some impairment in

social, occupational, or school functioning.  DSM IV-TR, at 34.  The

American Psychiatric Association no longer recommends use of the GAF

score.  Diagnostic and Statistical Manual of Mental Disorders (5th ed.

2013), at 16.  Wren indicated that Lefler partially achieved her goals and

would continue her current care plan.  R. 358.

On November 19, 2014, Lefler saw advanced practice nurse Barry to

discuss the results of a breast biopsy. [1]  R. 683-86.  Lefler said that her

knee was better with less pain and she was still doing physical therapy for

the knee.  Barry noted that Lefler's TLIF surgery was scheduled for

---

[1] At some point Barry secured an advanced practice nurse (APN) credential.  At the 2013 examination
she had a certified nurse practitioner (CNP) credential. R. 705.

December 2, 2016. The surgery was scheduled to be at L4-L5 and L5-S1, not just L5-S1. R. 683. On examination, Lefler had normal respiration. She had limited weight bearing on the left knee, with left knee instability and pain to palpation. Her mood and affect were normal. R. 686. The biopsy showed cancer in Lefler's left breast. Barry referred Lefler to an oncologist. R. 687.

On December 5, 2014, Dr. Christian Zwick, D.O., performed a lumpectomy surgery on Lefler's left breast to treat her breast cancer. She tolerated the procedure well. R. 327-28.

On January 19, 2015, Lefler saw Dr. Karthik Koduru for a follow up from her breast cancer surgery. Her wound from the surgery healed well. R. 396.

On March 19, 2015, Lefler saw Dr. Koduru for a follow-up after her radiation treatment following breast cancer surgery. Lefler tolerated the radiation treatments well. R. 403. Dr. Koduru put Lefler on tamoxifen. R. 399.

On April 8, 2015, Dr. Kukkar performed the planned L4-L5 and L5-S1 TLIF with discectomy surgery on Lefler. R. 413-18. On April 21, 2015, Lefler's lumbar spine was x-rayed. The x-rays showed postsurgical changes in expected alignment. R. 538.

On May 19, 2015, Lefler had x-rays of her lumbar spine. The x-rays showed the posterior rods and pedicle screws at L4, L5 and S1 were stable, the disc spacers were seen at L4-L5 and L5-S1, the alignment was preserved, the hardware from her surgery was intact, and there were no acute fractures. R. 549.

On June 19, 2015, Lefler saw psychologist Dr. Frank Froman, Ed.D., for a consultative examination. R. 544-49. Lefler was early for the examination and she listed her problems quickly. She relayed that she lived with her long-time boyfriend and helped raise his three children. She was "well attired and of excellent hygiene." R. 544. She reported that she suffered from bipolar disorder and depression and went to Transitions for 20 years for psychiatric treatment and counseling. Dr. Sanchez at Transitions prescribed her medication for mental impairments. She had worked as a waitress for 23 years and had three back surgeries. The first was when she was 18 years old. The TLIF was the most recent. R. 544-45.

Dr. Froman assessed bipolar disorder with strong depressive indicators and history of ADHD and low to borderline intellectual functioning by interview. Dr. Froman concluded:

**CONCLUSIONS:** Janet is likely able to perform simple one or two step assemblies, but probably not at a competitive rate. She appears quite slowed.

I believe that nevertheless, she would be able to get along reasonably well with others, as long as they do not "cause her any difficulties." She has a limited ability to tolerate discord. She appears able to understand simple oral and written instructions, although often finds herself saying "huh?" in response to what people are telling her. She also is intrusive, tends to "walk on" the speech of others. I had to repeat instructions, or questions, a number of times for her to clearly get them.

She appears able to manage benefits, but would have a difficult time, in my opinion, dealing with the stress associated with customary employment. At this time, she seems discouraged, angry, and possesses few resources, both psychologically and intellectually, to be able to cope with the physical and psychological load that she has experienced.

. . . .

Janet served as her own informant. She was extraordinarily emphatic about the difficulties that she was facing, and communicated them extremely clearly.

R. 546-477.

On June 30, 2015, state agency psychologist Dr. Linda Lanier, Ph.D., prepared a Psychiatric Review Technique and a Mental Residual Functional Capacity Assessment of Lefler. R. 73-74, 78-79. Dr. Lanier opined that Lefler had affective disorders and anxiety disorders. Dr. Lanier found that Lefler's mental impairments moderately affected her ability to engage in activities of daily living; maintain social functioning; and maintain concentration, persistence, or pace. Dr. Lanier found that Lefler had one or

two episodes of decompensation.  R. 73-74.  Dr. Lanier opined that Lefler

was moderately limited in her ability to carry out detailed instructions and in

maintaining attention and concentration for extended periods.  Lefler was

moderately limited in her ability to maintain working for a normal workday

and workweek due to lowered concentration due to mood and anxiety

disorders.  Dr. Lanier opined that Lefler was markedly limited in her ability

to deal with the general public and moderately limited in her ability to

respond appropriately to supervisors and to get along with coworkers.  R.

78-79.  Dr. Lanier concluded:

> Clmt has the cognitive ability to remember general work
> procedures, and retains the capacity to understand and
> remember at least simple instructions.  She has attention and
> concentration necessary to persevere at and complete those
> operations for time periods usually expected in the work force.
> She retains the capacity to maintain a schedule and be on time.
> She would need only common supervision.  She has the pace
> and endurance necessary to fulfill a normal workday and week
> on a consistent basis, to perform at a consistent acceptable
> rate, and would require only common numbers and lengths of
> rest breaks.  She has lowered social tolerance due to mood and
> anxiety disorders, but can relate appropriately in socially
> undemanding settings with low stress demands that require
> only brief superficial interactions and with reduced interpersonal
> contact away from the general public.  She retains the capacity
> to adapt to simple changes in daily routines, and the capacity to
> be aware of and self-protective of common hazards. She
> retains the capacity to utilize public transportation to and from a
> place of work.

R. 79.

On July 1, 2015, Lefler had x-rays of her lumbar spine.  The x-rays showed stable postoperative changes with no acute findings.  R. 551.

On July 2, 2015, Lefler saw Dr. Kukkar for a postoperative check on her back. Lefler was "doing excellent."  She was walking without support and she had good neurological function and 5/5 power in her lower extremities.  She had some coccygeal pain from the automobile accident. Straight leg testing was negative.  R. 552-53.

On July 23, 2015, Lefler saw Dr. Joseph Kozma, M.D., for a consultative examination.  R. 639-44.  She reported that her low back pain was the main problem that kept her from working and rated her pain as 10/10 constantly.  She also was stiff and said she could not work because of the pain and stiffness.  She had knee pain all the time and wheezed because of her COPD.  She wore a back brace and took it off for the examination.  R. 639.

On examination, Lefler was 64 inches tall and weighed 163 pounds. Her lungs were clear to percussion and auscultation, respiration was not labored, and she did not use auxiliary muscles to breathe.  Her upper extremities had normal strength, her dexterity was normal, and her grip strength was 4/5 bilaterally.  Her lower extremities had normal muscle development, some limited range of motion, no swelling, no tenderness in

any joint, and no crepitus in any joint.  She had tenderness in her lumbar, sacroiliac, and thoracic spine.  Her paravertebral muscles had normal tone. R. 642.

Lefler could heel and toe walk on the right but not the left.  She squatted halfway; she did not bend at the waist; she had limited range of motion in her lumbar spine; she had a normal gait, normal posture, and no postural instability.  R. 643.

Dr. Kozma concluded that Lefler's decreased grip strength would not interfere with daily activities of living.  The functional performance of Lefler's hips, left knee, and low back were decreased due to pain.  Dr. Kozma opined that Lefler exaggerated the level of pain in her low back.  He stated that his observations of Lefler during the examination did not indicated a pain level of 10/10.  He noted that Lefler was still in the recovery period for her latest back surgery so the prognosis of her back condition was unknown at the time of the examination.  Dr. Kozma concluded that Lefler's knee discomfort was fairly well under control.  He noted that Lefler said she used a walker at home but did not use it in public. R. 643.  Dr. Kozma's impression was chronic low back pain postoperative; bipolar disorder, treated and fairly well under control; chronic left knee pain

cause undetermined; and COPD treated intensively and extensively.  R. 644.

On July 30, 2015, Lefler saw advanced practice nurse Barry for a follow up.  R. 657-60.  Lefler said her health was good.  Her back ached constantly but she had less pain and she did not use the back brace.  She wore her knee brace and walked "a lot."  Her knee was unstable without the brace.  Her breathing was worse with heat and humidity but was "okay" at the time of the examination.  R. 657.

On examination, Lefler had normal breath sounds and normal respiratory rhythm and effort; her lungs were clear; and she had no cough. Lefler had a normal gait, normal movement of all extremities, normal muscle strength and tone, and no edema.  She had full range of motion of all her extremities with no peripheral edema.  She had no abnormalities in her back and no tenderness on palpation.  She was oriented and her affect and mood were normal.  Barry assessed ACL tear, back pain, bipolar disorder, and COPD and ordered a follow-up examination in two months. R. 660.

On August 14, 2015, state agency physician Dr. Richard Lee Smith, M.D., prepared a Physical Residual Functional Capacity Assessment.  R. 75-77.  Dr. Smith opined that Lefler could lift 20 pounds occasionally and

10 pounds frequently; stand and/or walk for six hours in an eight-hour workday; and sit for six hours in an eight-hour workday.  Dr. Smith found that Lefler was limited in her ability to push and pull with her left lower extremity.  She could occasionally: climb ramps, stairs, ropes, and ladders; crouch; kneel; and stoop.  She could frequently crawl.  Dr. Smith opined that Lefler should avoid concentrated exposer to odors, dust, fumes, gases, and poor ventilation.  R. 75-76.

On October 5, 2015, Lefler completed a Function Report-Adult form (Function Report).  R. 279-86.  She lived in an apartment with her boyfriend of 23 years.  She had memory problems, her bipolar disorder caused her to not want to be around other people, her back surgery did not allow her to bend, and her knee was very painful when standing or walking.  R. 279. She watched television.  On a good day, she walked her dog around the block.  She took care of her dog, but her boyfriend bent over to connect the leash to the dog's collar.  She had trouble sleeping and woke up three times a night.  She had trouble bending over to put on socks and shoes. Her boyfriend helped her shave her legs and she cared for herself otherwise.  R. 280

Lefler said in the Function Report that she needed reminders to take showers, to make doctor's appointments, and to order prescription refills.

She made TV dinners and sandwiches and did not read recipes much. When she felt good, she cooked a sit-down meal. She washed dishes and watered the plants at home. R. 281. She did not do other housework or yardwork because of pain in her back, an inability to bend, and her mood. She went shopping for an hour at a time for personal items and food. She did not go out alone because she did not feel comfortable in public. She watched television, cared for her dog, and read on a daily basis. R. 283.

Lefler said in the Function Report that her impairments affected her ability to lift, squat, bend, stand, reach, walk, sit, kneel, hear, climb stairs, remember, concentrate, complete tasks, understand, follow instructions, and get along with others. She could walk a block before she had to rest for five minutes. She could pay attention for one minute and did not finish what she started. She got along with authority figures "ok" depending on the supervisor and was fired in 2008 for hitting her boss. She could not handle stress and changes in routines and was afraid to drive. She wore a brace for her back and her knee "all the time." R. 284-85.

On October 27, 2015, Lefler had x-rays of her lumbar spine. The x-rays showed stable postoperative changes with no definitive evidence of acute fracture or subluxation. R. 740.

On November 15, 2015, Lefler had a chest -ray.  The x-ray showed chronic fibrotic changes but no definite consolidation or effusions.  The radiologist's impression was no active disease.  R. 821.

On November 24, 2015, state agency physician Dr. Dimitri Teague, M.D., prepared a Physical Residual Functional Capacity Assessment.  Dr. Teague opined that Lefler could lift 20 pounds occasionally and 10 pounds frequently; stand and/or walk for six hours in an eight-hour workday; sit for six hours in an eight-hour workday; and frequently push or pull with her left lower extremity.  She could occasionally: climb ramps, stairs, ropes, and ladders; crouch; kneel; crawl; and stoop.  She could frequently balance.  Dr. Teague opined that Lefler should avoid concentrated exposure to odors, dust, fumes, gases, and poor ventilation.  R. 110-12.

On December 9, 2015, Lefler saw advanced practice nurse Barry for preoperative clearance for a hysterectomy and oophorectomy.  Lefler could walk four blocks without symptoms but could not climb two flights of stairs without symptoms.  She walked her dog daily and was working on losing weight.  On examination, she was 5 feet 4 inches tall and weighed 153 pounds 6.4 ounces.  She had normal respiratory effort with clear bilateral breath sounds and no cough.  She had a normal gait, no joint swelling, normal movement in all extremities, normal muscle tone and strength in all

extremities.  Her back had no visible abnormalities and no tenderness on

palpation.  She was oriented and had normal mood and affect.  R. 713-14.

On December 18, 2015, Lefler saw Dr. Froman again for another

consultative mental status examination.  R. 715-18.  After this examination,

Dr. Froman assessed Bipolar II disorder; ADHD - combined type;

obsessive compulsive disorder; borderline intellectual functioning by

interview.  R. 717.  Dr. Froman concluded:

> **CONCLUSIONS:**   If she is physically able to handle it, I believe
> that Janet would easily be able to perform one or two step
> assemblies at a competitive rate.  She is still able to relate
> adequately to others, understand oral and simple written
> instructions and manage benefits.  She appears able to
> withstand the stress associated with low levels of employment
> as long as they do not tax her memory greatly.  I strongly doubt
> that she would be able to perform the work of a waitress, if she
> had to remember "who got what," and use a working memory,
> which seems at this point to be deficient.

R. 718.

On January 5, 2016, Lefler saw Dr. Jean Alexandre, M.D., for a

consultation regarding a prophylactic oophorectomy surgery to remove her

ovaries given her history of breast cancer.  Drs. Zwick and Koduru

recommended the surgery.  On examination, Lefler was alert, with good

hygiene, and cooperative.  R. 721.  Dr. Alexandre recommended a

complete hysterectomy and oophorectomy and performed the surgery on

January 8, 2016.  Lefler was discharged on January 9, 2016.  R. 723.

On January 5, 2016, state agency psychologist Dr. David Biscardi, Ph.D., prepared a Psychiatric Review Technique and Mental Residual Functional Capacity Assessment.  R. 108-09.  Dr. Biscardi opined that Lefler had affective disorders and anxiety disorders.  He found that her mental impairments moderately affected Lefler's ability to engage in activities of daily living; maintain social functioning; and maintain concentration, persistence, or pace. He found that Lefler had no episodes of decompensation.  R. 108-09, 114-15.  Dr. Biscardi found that Lefler was moderately limited in her ability to remember locations and work-like procedures, and markedly limited in her ability to understand, remember, and carry out detailed instructions.  She was moderately limited in her ability to work in proximity to others and to complete a normal workday and workweek.  She was markedly limited in her ability to deal with the general public and moderately limited in her ability to respond appropriately with supervisors and to get along with coworkers.  She was moderately limited in her ability to respond to changes in work settings and in her ability to take public transportation.  R. 114-15.  Dr. Biscardi concluded:

> Clmt retains the capacity to understand, remember, carry out and sustain performance of 1-2 step tasks (but would become overwhelmed if the procedures were more complicated), complete a normal workday, interact briefly /superficially with coworkers /supervisors with no public contact, and adapt to

changes /stressors associated with simple routine competitive work activities.

R. 115.

On January 26, 2016, Lefler had x-rays of her lumbar spine.  The x-rays showed stable postoperative changes without acute fracture or subluxation.  R. 745.

On January 28, 2016, Lefler saw Dr. Kukkar for postoperative follow-up.  R. 1000-02.  Lefler complained of back pain and initially rated the back pain at 6/10.  During her examination, she rated her pain at 3/10 and reported the average pain was 3/10.  She was not taking any medication for her back pain and exercised regularly.  R. 1000.  On examination, Lefler had normal gait and station, normal inspection and palpation of her joints, bones, and muscles, normal range of motion, normal strength and muscle tone, and normal upper and lower extremity compartments.  She had no tenderness in her back and her range of motion of her lumbar spine was restricted but painless.  Her foot, ankle, knee, and hip strength was normal bilaterally.  Straight leg testing and spine instability testing were negative. Lefler was oriented and normal mood and affect.  The January 26, 2016 x-rays showed good position of the hardware in her back and good healing. R. 1001-02.  Her left knee had full range of motion and normal motor function.  The Anterior Drawer Sign, Lachman's Test, and Pivot Shift Test

were all positive on her left knee, indicative of the ACL tear.  Dr. Kukkar

told Lefler to continue her walking and home exercise program.  R. 1002.

Dr. Kukkar noted that she was due for a left ACL repair surgery.  R. 1000.

On February 10, 2016, Lefler was admitted to Blessing Hospital.  She

saw psychiatrist Dr. Valentina Vrtikapa, M.D., complaining of "feeling

hyper."  In the past two weeks, she was hyper and "angry, irritable, manicky

(sic), not sleeping."  She reported racing thoughts.  Dr. Vrtikapa noted that

her medications apparently quit working.  R. 775.  Lefler denied hearing

voices, feeling paranoia, or having delusions.  She denied any suicidal or

homicidal ideations.  Dr. Vrtikapa assessed bipolar disorder, most recent

episode, manic, severe, without psychotic features; chronic mental illness;

and a GAF score of 35.  R. 775-76.  A GAF score of 31 to 40 indicated

either some impairment in reality or communication testing or major

impairment in several areas, such as social, occupational, school, family

relations, judgment, thinking, or mood.  DSM IV-TR, at 34.  Dr. Vrtikapa

changed Lefler's medication to Depakote and Risperdal.  R. 776.

Lefler was discharged from Blessing Hospital on February 12, 2016.

She responded well to the medication change and was stable.  Her mood

improved and her thoughts became better organized.  Her speech and

language were appropriate.  Her mood was neutral, and her affect was

Page **22** of **44**

appropriate and full range.  She denied any homicidal or suicidal ideations and denied any hallucinations or delusions.  Dr. Vrtikapa gave her a GAF score of 50 at discharge.  R. 783.  A GAF score of 41 to 50 indicated either serious symptoms or any serious impairment in social, occupational, or school functioning.  DSM IV-TR, at 34.

On April 27, 2016, Lefler saw Dr. Vrtikapa for medication management.  R. 861.  She wanted to change psychiatrists from Dr. Sanchez at Transitions.  Dr. Vrtikapa characterized Lefler as "very manipulative."  She did well on her new medication.  At times she felt somewhat hyper and other times she felt down.  She was not suicidal or homicidal.  R. 861.  Lefler's mental status examination was normal except for her affect which was sometimes hyper and sometimes down.  Her psychiatric condition was improving.  Dr. Vrtikapa continued Lefler's current treatment.  R. 862.

On May 25, 2016, Lefler saw Dr. Vrtikapa for medication management.  Lefler, "Feels down, anxious, worried, manipulative."  She was not suicidal.  R. 857.  Her mental status examination was normal except for an abnormal anxious depressed affect.  Her psychiatric condition was improving.  Dr. Vrtikapa adjusted Lefler's medication and prescribed individual therapy.  R. 858.

On July 6, 2016, Lefler had her left hand x-rayed for osteoarthritis in her left thumb.   The radiologist's notes stated:

> PATIENT STATED THE PAIN STARTED ABOUT 2 MONTHS AGO.  PATIENT'S JOB CONSISTS OF COOKING LIGHT LUNCH AND DOING SOME LAUNDRY FOR AN ELDERLY MAN, WALKS HER DOG WITH A STOP-AND-GO LEASH. PAIN MOSTLY IN LEFT THUMB WITH CERTAIN MOVEMENTS.  PATIENT HAD A LOT OF PAIN WITH LATERAL HAND VIEW.

R. 835.  The x-rays showed mild degenerative joint changes at the first carpal metacarpal joint with no fracture.  R. 835.

On July 19, 2016, Lefler did not show up at an appointment at Transitions.  She called and stated that she could not make the appointment because she was working from 8:00 a.m. to 6:00 p.m. that day.  She asked the therapist to call to reschedule.  The therapist called but Lefler did not answer and did not call back to reschedule.  R. 993.

On August 10, 2016, Lefler saw Dr. Vrtikapa for medication management.  R. 853.  She felt irritable and angry, with significant borderline traits.  She felt somewhat down and anxious.  She denied feeling hopeless, helpless, worthless, or suicidal.  R. 853.  Her mental status examination was normal except for an irritable down affect and her psychiatric condition was deteriorating.  Dr. Vrtikapa assessed borderline personality disorders and major depressive disorder recurrent without

psychotic features.  He adjusted Lefler's medication and continued her treatment.  R. 854.

On September 6, 2016, licensed clinical professional counselor Nancy Weede, LCPC, at Transitions prepared a Closing Summary/Continuing Care Plan for Lefler.  R. 944-45.  Weede stated that Lefler transferred her care to another provider and that Lefler's GAF scores were 65 when she started care at Transitions and 69 at her last treatment session at Transitions.  R. 944.

On October 5, 2016, Lefler saw advanced practice nurse Barry.  R. 881-84.  She had back pain that radiated down her leg.  Physical therapy helped and she was walking a mile a day and doing home exercises.  She wore her back brace when needed and her knee pain "comes and goes." Her breathing was "generally good."  R. 881.  On examination, Lefler wheezed on the right with inspiration and wheezed in both lungs with expiration.  She had normal respiratory rhythm and effort and no cough, normal gait and normal muscle strength and tone.  She had discomfort in range of motion of the lumbar spine, but no tenderness to palpation.  Her left knee was tender to palpation.  She was oriented and had normal mood and affect.  R. 884.

On October 19, 2016, Lefler saw Dr. Vrtikapa for medication management.  Her depression was stable and she denied feelings of hopelessness, helplessness, and worthlessness.  R. 849.  Her mental status examination was normal in all respects and her psychiatric condition was stable.  Dr. Vrtikapa assessed major depressive disorder, recurrent severe without psychotic features; and borderline personality disorder.  Dr. Vrtikapa continued her medication and treatment.  R. 850-51.

On November 15, 2016, Lefler saw advanced practice nurse Barry for a follow-up.  Lefler had an abnormal back examination, but normal gait, muscle strength, and tone.  Her breathing was normal.  She had an anxious, depressed and frustrated mood; and frustrated but agitated affect.  R. 879.  Barry referred Lefler to pain management evaluation for her cervical radicular pain and low back pain with sciatica.  R. 875.

On December 29, 2016, Lefler went to the Pain Management Center at Blessing hospital to see licensed clinical social worker Bridget Ormond, LCSW, for a biopsychosocial assessment.  Lefler reported that she had been skipping her mental health medications prescribed by Dr. Vrtikapa but was taking them at the time of the visit.  Her depression was bad and she had been isolating herself.  She lived with her boyfriend and was close to her sister.  She slept well, walked her dogs several times a day, and

engaged in stretching exercises at home.   R. 830.  Ormond recommended

intensive therapy for Lefler's mental impairments.  She opined that her pain

management treatment may be difficult unless her mental health was

controlled.  R. 831.

On February 23, 2017, Lefler saw psychiatrist Dr. Benjoy John, M.D.,

for medication management.  Lefler transferred her care to Dr. John from

Dr. Vrtikapa.  She had quit taking one of the medications, Lexapro, that Dr.

Vrtikapa prescribed.  She was taking the other medication Dr. Vrtikapa

prescribed, Risperdal, and found it to be effective.  She had mood swings,

anxiety, worries about getting disability, and cluster B features.  She denied

any homicidal or suicidal ideations.  R. 845.  Dr. John noted that Lefler had

a history of seeing several different psychiatrists and poor adherence to

treatment regimens.  Her mental status examination showed that her

behavior was dramatic; her affect was labile with giggles and animated; her

cognition showed possible deficits; her attitude toward treatment was fair;

and her compliance to treatment was erratic.  Her mental status

examination was otherwise normal and her psychiatric condition was

stable.  Dr. John assessed bipolar affective disorder, anxiety, and

borderline personality disorder and prescribed Buspar.  R. 846-47.

On January 10, 2017, counselor Weede at Transitions prepared a Mental Health Assessment of Lefler.  R. 932-43.  Weede indicated that Lefler had no difficulties with daily living skills.  R. 934.  Weede assessed Lefler with bipolar I disorder current or most recent episode manic—moderate.  Weede gave Lefler a GAF score of 59.  R. 939-40.  A GAF score from 51 to 60 meant moderate symptoms or moderate difficulty in social, occupational, or school functioning.  DSM-IV-TR, at 34.  Weede identified Lefler's current symptoms as mania or hypomania, depression, and anxiety.  R. 940.

On March 15, 2017, Lefler saw Dr. John for medication management. Lefler reported mood swings, sleep disturbances, periods of feeling hyper, and memory issues.  In addition, the Buspar made her dizzy.  Lefler had significant cluster B features.  She denied any homicidal or suicidal ideations.  R. 841.  Lefler's mental status examination showed that her behavior was histrionic; her affect was labile, and she smiled appropriately; her insight, judgment, and impulse control were fair; and her cognition showed possible deficits.  Her mental status examination was otherwise normal and her psychiatric condition was stable.  Dr. John assessed bipolar affective disorder, borderline personality disorder, anxiety, and memory

disturbance.  Dr. John stopped the Buspar prescription and added Depakote and Vistaril to the Risperdal.  R. 842-43.

On March 29, 2017, Lefler saw advanced practice nurse Barry.  R. 865-69.  Her back pain was unchanged and knee pain was worse.  She was walking her dog three times a day.  R. 865.  On examination, her respiration was normal with clear breath sounds bilaterally.  She had normal gait, normal muscle strength and tone, and normal range of motion except for decreased range of motion in her lumbar spine.  She was oriented with normal mood and affect.  R. 867.

### THE EVIDENTIARY HEARING

On July 27, 2017, the Administrative Law Judge (ALJ) conducted an evidentiary hearing.  Lefler appeared with her attorney.  R. 39-66.  Vocational expert Donald Hecker was also present by telephone.  R. 41.  Lefler testified first and stated that she became disabled on July 31, 2014 when she was hit by a car.  This was her last day of work before her scheduled back surgery .  She quit work as a waitress because of her scheduled back surgery.  R. 43-44.

Lefler testified that she worked for 26 years as a waitress and last worked as a waitress at the Elks Club in Quincy, Illinois.  R. 44.  In the weeks before she quit her waitress job, she experienced pain with every

step.  She said, "Sometimes excruciating pain but I made it through the night, made my tips."  R. 45.  She told the Elks Club representatives that she quit because of her back pain.  R. 45-46.

Lefler said that the TLIF back surgery did not take care of her back. Her back was worse after the surgery and she indicated she would never have a fourth back surgery.  R. 46.   The surgery did not improve the pain that went down her left leg.  R. 49.  Lefler also had tried a stimulator and TENS unit on her back pain.  Neither provided any relief.  R. 50.

Lefler also testified that after her breast surgery, she had problems with her arm.  She had arthritis in the arm from waitressing and the pain in her arm was worse from the elbow down.  She had trigger finger and problems with her thumb.  R. 46.  Lefler had braces for her hands that were prescribed by advanced practice nurse Barry.  R. 47.  Lefler stated that she had problems with her grip and fumbled and dropped things.  Her hands and fingers went numb four times a day.  The numbness went from the fingertips to the elbows.  She had problems writing and said it was hard even to write her name.  R. 48. Lefler wore braces on her wrists all the time unless she had a hot flash.  She had hot flashes after her hysterectomy.  R. 56-57.

Lefler reported she got a torn left ACL in the accident and she had not yet had surgery to repair the ACL.  R. 43-44.  She put off the surgery because, "I feel I'm in enough pain.  I don't want any more pain.  I was in a brace for quite some time in my knee.  And it's just  it's very . . .  painful."  R. 49.  Lefler's pain medication made her tired.  R. 55.

Lefler said she could walk half a block before she was short of breath.  She used a nebulizer twice a day and used a rescue inhaler.  R. 48.

Lefler treated her back pain with heat and ice.  She used heat three to four times a day, for 20 minutes each time.  R. 51.  She applied the heat while lying down with a pillow under her legs and she spent most of her time lying down.  She typically spent five hours during the daytime lying down and took 45-minute naps twice a day.  R. 51-52.  The back pain woke her up three to four times at night.  R. 55.  Lefler wore a back brace prescribed by Dr. Kukkar.  R. 56.

Lefler used a shower chair to take a shower.  She had problems shaving her legs and trimming her toenails.  She had no problems dressing herself except for putting on shoes and socks.  Her boyfriend put on her shoes and socks.  R. 55.

Lefler also had been treated for bipolar disorder for 20 years.  Her symptoms were worse in the two and half years before the hearing.  She

had manic episodes about four times a year and her manic symptoms have caused her to not sleep for two days at a time.  She was in a rage during these manic episodes and also had days during her manic episodes in which she felt no pain.  R. 52-53.

Lefler said she had good days and bad days with her mental impairments.  She had 25 bad days a month and on these days, she was depressed, crying all the time, and lying down in her bedroom alone with the lights off.  R. 53-54.

Lefler testified she helped a 91-year old man by walking his dog around the man's yard, but she was not paid for this.  She went over to the man's house about twice a week.  She denied that she prepared meals or did laundry for the man.  R. 58-59.

Vocational expert Hecker then testified.  The ALJ asked Hecker the following hypothetical question:

> Then I'm going to ask you to assume a hypothetical individual of the claimant 's age, education and past work experience. And this individual is limited to light work.  They could never climb ladders, ropes, or scaffolds.  They could occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl.  They should never be exposed to unprotected heights, moving mechanical parts or operate a motor vehicle as a job duty.  They could have occasional exposure to vibration.  They would be limited to simple routine tasks and simple work-related decisions.  And they could have occasional interaction with supervisors and coworkers. And no interaction with the public.  Can that individual do claimant 's past work?

Page **32** of **44**

R. 62-63.  Hecker opined that such a person could not perform Lefler's past

work as a waitress.  Such a person could work as a deli cutter, with 62,000

such jobs in the national economy; a silver wrapper with 73,100 such jobs

in the national economy; and a laundry worker, with 255,400 such jobs in

the national economy.  Hecker noted that in his experience a person

working as a silver wrapper also worked as a dishwasher.  He opined that

the person described in the question could perform the silver wrapper job,

including the dishwashing.  Hecker testified that the person in the

hypothetical question could also perform other jobs that exist in the national

economy.  R. 63.

Hecker opined that the person described in the hypothetical question

could not work if she had an additional limitation of no more than

occasional handling and fingering.  R. 64.  The hearing then concluded.  R.

64.

<u>THE DECISION OF THE ALJ</u>

On November 20, 2017, the ALJ issued his decision.  R. 15-32.  The

ALJ followed the five-step analysis set forth in Social Security

Administration Regulations (Analysis).  20 C.F.R. §§ 404.1520, 416.920.

Step 1 requires that the claimant not be currently engaged in substantial

gainful activity.  20 C.F.R. §§ 404.1520(b), 416.920(b).  If true, Step 2

requires the claimant to have a severe impairment.  20 C.F.R. §§
404.1520(c), 416.920(c).  If true, Step 3 requires a determination of
whether the claimant is so severely impaired that she is disabled
regardless of her age, education and work experience.  20 C.F.R. §§
404.1520(d), 416.920(d).  To meet this requirement at Step 3, the
claimant's condition must meet or be equal to the criteria of one of the
impairments specified in 20 C.F.R. Part 404 Subpart P, Appendix 1
(Listing).  20 C.F.R. §§ 404.1520(d), 416.920(d).  If the claimant is not so
severely impaired, the ALJ proceeds to Step 4 of the Analysis.

Step 4 requires the claimant not to be able to return to her prior work
considering her age, education, work experience, and Residual Functional
Capacity (RFC).  20 C.F.R. §§ 404.1520(e) and (f), 416.920(e) and (f).  If
the claimant cannot return to her prior work, then Step 5 requires a
determination of whether the claimant is disabled considering her RFC,
age, education, and past work experience.  20 C.F.R. §§ 404.1520(g),
404.1560(c), 416.920(g), 416.960(c).  The claimant has the burden of
presenting evidence and proving the issues on the first four steps.  The
Commissioner has the burden to present evidence on the last step; the
Commissioner must present evidence that, considering the listed factors,
the claimant can perform some type of gainful employment that exists in

the national economy.  20 C.F.R. §§ 404.1512, 404.1560(c); Weatherbee v. Astrue, 649 F.3d 565, 569 (7th Cir. 2011); Briscoe ex rel. Taylor v. Barnhart, 425 F.3d 345, 352 (7th Cir. 2005).

The ALJ found that Lefler met her burden at Steps 1 and 2.  She had not engaged in substantial gainful activity since July 31, 2014, and she suffered from the severe impairments of spondylolisthesis of the lumbar spine status post TLIF surgery, failed back syndrome, left knee ACL tear, bipolar disorder, borderline personality disorder, and major depressive disorder.  R. 17-18.  The ALJ found that  Lefler's status post breast cancer surgery was not a severe impairment because no medical evidence showed that she had continuing functional limitations after she recovered from her treatments.  The ALJ found that Lefler's carpal tunnel symptoms were not severe because there were no medical records of any treatment other than advanced practice nurse Barry gave her wrist splints.  In addition, Lefler stated at the time of her July 6, 2016 x-ray of her left thumb that she cooked meals and did laundry for an elderly man.  R. 18; see R. 835.  The ALJ thus found that Lefler's carpal tunnel symptoms did not significantly limit her ability to perform work functions.  The ALJ concluded that her symptoms with her hands were non-severe.  R. 18.

The ALJ found at Step 3 that Lefler's impairments or combination of impairments did not meet or equal any Listing.  R. 18-21.

The ALJ then determined that Lefler had the following RFC:

> After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except that she can climb ramps and stairs occasionally, never climb ladders, ropes, or scaffolds, and occasionally balance, stoop, kneel, crouch, and crawl.  In addition, the claimant can never work at unprotected heights, around moving mechanical parts, and can never operate a motor vehicle.  She can occasionally be exposed to vibration.  The claimant is further limited to simple, routine tasks and simple work-related decisions.  She can have occasional interactions with supervisors and coworkers, but no interaction with the public.

R. 21.

The ALJ relied on the medical records, particularly from Dr. Kukkar and advanced practice nurse Barry, that TLIF surgery was successful and alleviated her back pain.  The ALJ also relied on Lefler's reports to her health care providers that she walked a mile a day; she walked her dogs three times a day; she did laundry, prepared meals, and walked the dog of an elderly man; and she worked from 8:00 a.m. to 6:00 p.m. for the elderly man.  The ALJ also relied on the medical records from Dr. Kukkar's January 2016 examination of Lefler's left knee that showed normal range of motion and motor function with no tenderness.  The ALJ also relied on the repeated findings that Lefler had normal respiration and the November 16,

2015 chest x-ray that showed no active disease.  The ALJ also relied on Dr. Kozma's consultative examination and the opinions of Drs. Smith and Teague for her physical limitations.  R. 21-25, 28.

The ALJ also relied on Lefler's normal mental status examinations; the reports from Dr. Vrtikapa that adjustments to her medication for mental impairments improved her condition, and her notation that Lefler was very manipulative; notes from Dr. John that Lefler was not compliant with her mental health medications; Dr. Froman's second assessment that Lefler could perform simple one and two step assembly at a competitive rate; and the opinions of psychologist Drs. Lanier and Biscardi that Lefler's mental impairments allowed her to work at the tasks described in the RFC.  R. 25-28.

The ALJ gave partial weight to the GAF scores because the scores were only assessments of a person's condition at a specific point in time. The GAF scores also considered factors unrelated to functional abilities, such as legal, housing and financial problems.  R. 29.

The ALJ gave little weight to Lefler's testimony about severe limitations because the testimony was inconsistent with the reports in the medical records that her back and knee were improving; that she walked a mile a day; that she walked her dog three times a day; that she did laundry

and prepared meals for an elderly man; sat with the elderly man for a few months and also walked his dog; and that she could not go to therapy because she was working from 8:00 a.m. to 6:00 p.m.  See  R. 18, 20, 22-25, 27

Upon determining Lefler's RFC, the ALJ found at Step 4 that Lefler could not perform her prior work as a waitress.  R. 30.  The ALJ found at Step 5 that she could perform a significant number of jobs in the national economy.  The ALJ relied on the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2, and the opinions of Vocational Expert Hecker that a person with Lefler's age, education, work experience and RFC could perform many jobs in the national economy such as deli cutter, silver wrapper,  and laundry worker.  The ALJ concluded that Lefler was not disabled.  R. 30-31.

Lefler appealed.  On December 17, 2018, the Appeals Council denied Lefler's request for review.  The decision of the ALJ then became the final decision of the Defendant Commissioner.  R. 1.  Lefler then brought this action for judicial review.

## ANALYSIS

This Court reviews the Decision of the Commissioner to determine whether it is supported by substantial evidence.  Substantial evidence is

"such relevant evidence as a reasonable mind might accept as adequate" to support the decision.  Richardson v. Perales, 402 U.S. 389, 401 (1971). This Court must accept the findings if they are supported by substantial evidence and may not substitute its judgment or reweigh the evidence. Jens v. Barnhart, 347 F.3d 209, 212 (7th Cir. 2003); Delgado v. Bowen, 782 F.2d 79, 82 (7th Cir. 1986).  This Court will not review the ALJ's evaluation of statements regarding the intensity, persistence, and limiting effect of symptoms unless the evaluation is patently wrong and lacks any explanation or support in the record.  See Pepper v. Colvin, 712 F.3d 351, 367 (7th Cir. 2014); Elder v. Astrue, 529 F.3d 408, 413-14 (7th Cir. 2008); SSR 16-3p, 2017 WL 5180304 (October 25, 2017) ( originally issued at 2016 WL 1119029, at *1 (March 24, 2016) (The Social Security Administration no longer uses the term credibility in the evaluation of statements regarding symptoms)).  The ALJ must articulate at least minimally his analysis of all relevant evidence.  Herron v. Shalala, 19 F.3d 329, 333 (7th Cir. 1994).  The ALJ must "build an accurate and logical bridge from the evidence to his conclusion."  Clifford v. Apfel, 227 F.3d 863, 872 (7th Cir. 2000).

The decision of the ALJ is supported by substantial evidence.  The medical evidence from Dr. Kukkar and advanced practice nurse Barry after

the TLIF surgery support the ALJ's conclusion that the surgery was successful to limit Lefler's pain.  Dr. Kukkar's January 2016 examination of Lefler's knee supported the ALJ's conclusion that Lefler's knee's functional capacity was improved and stable.  Lefler self reports that she walked a mile a day and walked her dog three times a day.  On June 28, 2016, Lefler told therapist Nancy Weede, LCPC, that she needed to cancel and reschedule an appointment because she had a job working at her scheduled appointment time.  R. 992.  On July 6, 2016, Lefler told her healthcare provider at Blessing Hospital that "her job consists of cooking a light lunch and doing some laundry for an elderly man".  R. 835.  On July 19, 2016, Lefler told Weede that she was working 8:00 a.m. – 6:00 p.m. and was not able to come to her appointment.  R. 993.  Lefler largely denied these statements during her testimony.  R. 57-59.  All of these activities support the physical aspects of the RFC finding.  The examination of Dr. Kozma and the opinions of Drs. Smith and Teague also support the physical aspects of the RFC finding.

The mental aspects of the RFC were supported by the numerous largely normal mental status examinations, the second report of Dr. Froman in which he opined that she could work simple one and two step assemblies at a competitive rate, the medical reports that indicated that on

several occasions when she had more severe symptoms she was not compliant with her medication, and the opinions of psychologists Drs. Lanier and Biscardi.

The inconsistencies between Lefler's testimony and the other evidence in the record supported the ALJ's conclusion to give her testimony little weight.  Her testimony was inconsistent with medical examination findings that showed improvement in her back after the TLIF surgery and improvement to her knee; and inconsistent with her reports to her health care professionals about her symptoms and her activities, such as extensive walking and exercising at home.  All this evidence supports the ALJ's RFC finding.

The RFC and the opinions of vocational expert Hecker support the conclusion at Step 5 that Lefler could perform a significant number of jobs in the national economy.  The ALJ's decision is supported by substantial evidence.

Lefler argues that the ALJ erred in the consideration of her testimony. The Court disagrees.  The ALJ must consider the statements of the claimant about her symptoms in light of all the evidence in the record. That is what the ALJ did.  The ALJ identified specific evidence in the medical records that were inconsistent with her testimony.  When such

inconsistencies exist, the ALJ can give less weight to the claimant's testimony.  SSR 16-3p, at 8 ("[I]f an individual's statements about the intensity, persistence, and limiting effects of symptoms are inconsistent with the objective medical evidence and the other evidence, we will determine that the individual's symptoms are less likely to reduce his or her capacities to perform work-related activities.").  There was no error.

Lefler argues that the ALJ did not address Lefler's limitations due to her breast cancer.  The Court disagrees.  Lefler testified that after her breast cancer surgery, she had symptoms of numbness from her elbows to her hands.  The ALJ addressed those symptoms at Step 2.  The ALJ found that the medical records were inconsistent with her testimony.   The medical records only mention numbness in the hands in the August 2013 visit with Barry.  According to the record, Barry  gave her the splints for carpal tunnel symptoms before August 2013, and so, long before her cancer surgery.   The ALJ correctly noted that Lefler was able to work at this time with those symptoms.  The ALJ also noted that Lefler's activities to cook and do laundry for an elderly man was inconsistent with her testimony about numbness in her hands.  R. 18.  The ALJ adequately addressed the issue of Lefler's testimony about numbness in her hands. There was no error.

Lefler also argues that the ALJ erred in not believing her testimony about her impairments concerning her back.  The Court again disagrees.  The ALJ considered the evidence and found that the TLIF surgery was successful in reducing her pain.  The ALJ relied on medical records, particularly the findings of Dr. Kukkar and advanced practice nurse Barry after the surgery.  Those examinations showed that the surgery was successful in that her pain was reduced and her functional ability was improved.  See R. 21-25, 549, 552-53, 657, 740, 745, 830, 881, 1000-02.  The ALJ did not err.

Lefler argues that the RFC finding was not supported by substantial evidence.  Lefler argues that the ALJ should have found that she was limited to sedentary work instead of light work.  The Court again disagrees.  The ALJ relied on the evidence discussed above to find that Lefler could perform a limited range of light work.  The evidence previously provided substantial evidence to support the ALJ's RFC finding.  There was no error.

THEREFORE, THIS COURT RECOMMENDS that the Defendant Commissioner's Motion for Summary Affirmance (d/e 17) should be ALLOWED, the Plaintiff Janet Lefler's Brief in Support of Motion for Summary Judgment (d/e 12) should be DENIED, and the decision of the Defendant Commissioner should be AFFIRMED.

The parties are advised that any objection to this Report and Recommendation must be filed in writing with the Clerk of the Court within fourteen days after service of a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2).  Failure to file a timely objection will constitute a waiver of objections on appeal.  See Video Views, Inc. v. Studio 21, Ltd., 797 F.2d 538, 539 (7th Cir. 1986).  See Local Rule 72.2.

ENTER:   June 17, 2020



_____s/ Tom Schanzle-Haskins_____

TOM SCHANZLE-HASKINS
UNITED STATES MAGISTRATE JUDGE